768 F.2d 352
 247 U.S.App.D.C. 235
 FAIC SECURITIES, INC.
v.
UNITED STATES of America, et al. Federal Home Loan Bank
Board, et al., Appellants.
SECURITIES INDUSTRY ASSOCIATION
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Federal Home
Loan Bank Board, et al., Appellants.
FAIC SECURITIES, INC.
v.
UNITED STATES of America, et al., Appellants,
Federal Home Loan Bank Board, et al.
SECURITIES INDUSTRY ASSOCIATION
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Appellants,
Federal Home Loan Bank Board, et al.
 Nos. 84-5408, 84-5409, 84-5411 and 84-1512.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 29, 1985.
Decided Jan. 30, 1985.
Opinion Filed July 26, 1985.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 84-00959 and 84-01136).
 Nicholas S. Zeppos, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellant Federal Deposit Ins. Corp. in Nos. 84-5411 and 84-5412.
 James A. Smith, Washington, D.C., with whom John Lansdale, Jr., James P. Murphy and William K. Black, Washington, D.C., were on brief, for appellants Federal Home Loan Bank Bd., et al., in Nos. 84-5408 and 84-5409.
 James E. Kaplan, Washington, D.C., with whom Jeffrey C. Martin and Lawrence J. Latto, Washington, D.C., were on brief, for appellee FAIC Securities, Inc. in Nos. 84-5408 and 84-5411. Bruce C. Swartz and Stephen J. Hadley, Washington, D.C., entered appearances for appellee in Nos. 84-5408 and 84-5411.
 James B. Weidner, New York City, with whom John M. Liftin was on brief, for appellee Securities Industry Ass'n in Nos. 84-5409 and 84-5412.
 Before MIKVA, EDWARDS and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge.
 
 
 1
 These appeals are from an order of the District Court declaring regulations promulgated by appellants, the Federal Deposit Insurance Corporation and the Federal Home Loan Bank Board, to be unlawful and enjoining their implementation. The regulations change the existing federal insurance coverage of $100,000 per depositor, per financial institution, by adding the qualification that coverage of funds deposited by or through a deposit broker is limited to $100,000 per broker, per financial institution. The issues presented are whether the appellees, FAIC Securities, Inc. ("FAIC"), and the Securities Industry Association ("SIA"), have standing to maintain the action, and whether the regulations exceed the appellants' statutory authority.
 
 
 2
 * The stock market crash of 1929 and the Great Depression of the 1930's resulted in an almost total collapse of the nation's banking system, with the result that a large part of the public ceased placing their money in banks, and banks were unable to extend credit. To restore depositor confidence and stimulate economic growth, Congress in 1933 established the federal deposit insurance system for eligible banks, and created the FDIC to administer it. Banking Act of 1933, ch. 89, 48 Stat. 162 (1933). The statutory provisions currently governing the FDIC were enacted in the Federal Deposit Insurance Act of 1950, Pub.L. No. 81-797, 64 Stat. 873 ("FDIA"). In 1934, Congress established the Federal Savings and Loan Insurance Corporation ("FSLIC"), which operates under the management and direction of the appellant Bank Board, see 12 U.S.C. Sec. 1725(a) (1982), to provide similar protection for eligible savings and loan associations. National Housing Act ("NHA"), ch. 847, 48 Stat. 1246 (1934).
 
 
 3
 Recent advances in technology, and Federal legislative and regulatory action,[1] have given birth to the deposit brokerage industry. Deposit brokers assist two types of investors in placing deposits. Some assist the large institutional customer to deposit millions of dollars of funds, directly and in its own name, in certificates of deposit none of which, in any single financial institution, exceeds the value of $100,000--the limit on federal insurance. The principal advantage of this service for the large investor is that all its funds will be federally insured. This form of brokerage, known as "deposit splitting," is engaged in by appellee FAIC. Other deposit brokers, among them the members of appellee SIA, serve smaller, individual investors in one of two ways. First, the broker, acting on its own or at the request of a financial institution, may solicit deposits from its customers, to be deposited with the institution either directly by the customers or by the broker (in which latter case the broker is listed as a nominee or agent, and notifies the financial institution that the funds are actually payable to the broker's individual customers). Second, a broker may engage in what is called (apparently with no apologies for transitiving an intransitive verb) "participating" certificates of deposit to its customers. Under this method a broker purchases a certificate of deposit, sells interests in the certificate to its customers, and then notifies the issuing financial institution that it has sold the participating units and requests that the deposits be registered in its name as nominee. Whichever of these methods is used, under existing law each customer receives federal deposit insurance up to the statutory limit of $100,000 per institution. The principal advantage of this service for the small investor is that the readily accessible broker can place his funds in distant banks with higher interest rates, or (at least according to the Bank Board) can negotiate higher rates by reason of its aggregation of funds.
 
 
 4
 In November 1983, the FDIC and the Bank Board issued a joint Advance Notice of Proposed Rulemaking soliciting comments on insured brokered deposits. 48 Fed.Reg. 50,339 (1983). The concern prompting the Notice was expressed as follows:
 
 
 5
 [D]eposit-placement practices enable virtually all institutions to attract large volumes of funds from outside their natural market area irrespective of the institutions' managerial and financial characteristics. The ability to obtain de facto one-hundred-percent deposit insurance through the parceling of funds eliminates the need for the depositor to analyze institutions' likelihood of continued financial viability. The availability of these funds to all institutions, irrespective of financial and managerial soundness, reduces market discipline.... This impediment to natural market forces results in increased costs to the FDIC and the FSLIC in the form of either greater insurance payments or higher assistance expenditures if the institutions are subsequently closed because of insolvency.
 
 
 6
 Id. at 50,340. Following an analysis of the comments received, on January 23, 1984 the FDIC and the Bank Board published a joint Notice of Proposed Rulemaking, 49 Fed.Reg. 2,787 (1984), and, after receipt and consideration of comments, jointly adopted the rule that is the subject of this appeal, Final Rule, Brokered Deposits; Limitations on Deposit Insurance, 49 Fed.Reg. 13,00 3 (1984) ("Final Rule"). It reads in relevant part as follows (unless otherwise indicated, italicized portions indicate language applicable only to the FDIC, and bracketed portions, language applicable only to the Bank Board):
 
 
 7
 Notwithstanding any other provision of this Part [12 C.F.R. Part 330 (FDIC); 12 C.F.R. Part 564 (Bank Board) ], funds deposited into [invested in] one or more deposit accounts by or through a deposit broker shall be added to any other deposits placed by or through that deposit broker and insured up to $100,000 in the aggregate.
 
 
 8
 Id. at 13,011, 13,012 (to be codified at 12 C.F.R. Secs. 330.13(b), 564.12(b)).
 
 
 9
 Appellees FAIC and SIA each filed separate actions in the District Court against both of the appellants, seeking judicial review pursuant to 5 U.S.C. Sec. 702 (1982), contending that the regulations contravene the FDIA and the NHA.[2] The District Court agreed, and granted the appellees' motion for summary judgment. See FAIC Securities, Inc. v. United States, 595 F.Supp. 73 (D.D.C.1984). These consolidated appeals followed. On January 30, 1985, we issued an order affirming the judgment of the District Court, 753 F.2d 166. This is the opinion which we announced at that time would follow.
 
 II
 
 10
 Appellee SIA is a national trade association whose members include "deposit brokers" within the meaning of that term as defined in the regulations at issue.[3] Appellee FAIC is itself a "deposit broker." Both appellees alleged in their complaints that the regulations will effectively eliminate the deposit brokerage industry, thus causing them direct economic injury, and depriving their customers of the benefits of placing deposits through a broker. Appellant Bank Board argues that this is not enough to establish their standing to sue for the alleged statutory violations here at issue, since "[t]he NHA and the FDIA are intended to protect the security of depositors, banks and thrifts, not the profits of deposit brokers." Brief for Appellant Bank Board at 52.
 
 
 11
 It is obvious, and the Bank Board does not contest, that the allegations suffice to establish the "irreducible minimum" that Article III of the Constitution requires a party to show: that he "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," that the injury "fairly can be traced to the challenged action" and that it is "likely to be redressed by a favorable decision." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (internal quotations and citations omitted). They must also meet, however, what the Supreme Court has described as one of the "prudential" requirements of standing: that the asserted interests fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. at 475, 102 S.Ct. at 760 (internal quotation and citation omitted). It is this element of standing that the Bank Board challenges.
 
 
 12
 The zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law, since Congress itself has pared back traditional prudential limitations, see Sierra Club v. Morton, 405 U.S. 727, 732-33 & n. 4, 92 S.Ct. 1361, 1364-65 & n. 4 (1972), by the Administrative Procedure Act, which affords review to any person "adversely affected or aggrieved by [federal] agency action within the meaning of a relevant statute," 5 U.S.C. Sec. 702 (1982). See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Compare Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (financial interests of taxpayers in neighboring communities not sufficient to sustain action against nonfederal defendants for allegedly unlawful zoning excluding low-income residents).
 
 
 13
 In this appeal, the Bank Board argues that the statutes relied upon, the NHA and the FDIA, were not intended to protect or regulate deposit brokers, and so their own interests do not satisfy the zone requirement. We need not decide whether that is correct,[4] since it would not in any case dispose of the standing question. The Bank Board argues that because the brokers' own interests do not meet the zone requirement the brokers simply lack standing; and that the question thus does not even arise whether they can assert in their suit the rights of third parties--their clients, the depositors. That appears to have been the point mooted by Justice Stevens' concurrence (providing the determinative fifth vote) in Singleton v. Wulff, 428 U.S. 106, 121-22, 96 S.Ct. 2868, 2877-78, 49 L.Ed.2d 826 (1976), which contains one of the Supreme Court's most extensive (if indeterminate, because of the 4-1-4 split) discussions of jus tertii standing. Justice Stevens was willing to acknowledge that the third-party rights could be asserted--at least in the circumstances of that case--only because the plaintiffs also alleged a violation of their own constitutional rights; he was "not sure," id. at 122, 96 S.Ct. at 2878, whether the third-party rights could be asserted if that allegation did not exist. The four-justice plurality evidently believed that satisfaction of the "injury in fact" requirement of Article III was all the plaintiffs had to establish initially, whereafter they could "piggy-back," so to speak, upon the third parties' inclusion within the zone of interests of the constitutional provision at issue--assuming that the requirements necessary for the assertion of third-party rights were met. Id. at 112-13, 96 S.Ct. at 2873-74. The four dissenting Justices did not address the point, but rested their position upon the plaintiffs' failure to meet what they viewed as the requirements for asserting third-party rights, in particular a requirement that the third parties have no practicable means of bringing their own challenge. Id. at 125-27, 96 S.Ct. at 2879-80.
 
 
 14
 Whatever dubiety Singleton might suggest, the issue seems to have been resolved conclusively against the Bank Board's contention in later cases. The clearest example is Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). There a vendor of beer sought injunctive and declaratory relief against application of a state statute prohibiting the sale of beer to males under the age of 21 and to females under the age of 18, on the sole ground that it denied males between the ages of 18 and 20 equal protection of the laws. The Court viewed the issue of standing to be whether the vendor could "rely upon the equal protection objections of males 18-20 years of age to establish her claim of unconstitutionality of the age-sex differential." Id. at 192-93, 97 S.Ct. at 454-55. It then held that the vendor had suffered "injury in fact" sufficient to satisfy the Article III requirements because she was "obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer ... sanctions and perhaps loss of license." Id. at 194, 97 S.Ct. at 455 (citations and internal quotations omitted). Finally, it then addressed the prudential standing considerations applicable to the case and held:
 
 
 15
 As a vendor with standing to challenge the lawfulness of [the statute], appellant Whitener is entitled to assert those concomitant rights of third parties that would be "diluted or adversely affected" should her constitutional challenge fail and the statutes remain in force.... Otherwise, the threatened imposition of governmental sanctions might deter ... vendors from selling ... beer to young males, thereby ensuring that "enforcement of the challenged restriction against the [vendor] would result indirectly in the violation of third parties' rights." ... Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.
 
 
 16
 Id. at 195, 97 S.Ct. at 456 (citations omitted). The beginning (and crucial) phrase in the foregoing excerpt, "As a vendor with standing to challenge the lawfulness of [the statute]," is perplexing. All elements of her standing had assuredly not been established, but only the "core" Article III requirement of injury in fact. Evidently (there is no other explanation for the case), the third parties' interests could be relied upon to satisfy the "zone of interests" requirement. Later cases to the same effect are Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (involving the vendor of contraceptive devices), and City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 242-43, 103 S.Ct. 2979, 2982-83, 77 L.Ed.2d 605 (1983) (involving the provisioner of medical services to a person allegedly injured by unconstitutional state action). We have been unable to find any case in which the Supreme Court has relied upon the plaintiff's failure independently to meet the zone of interests test as the basis for its refusal to accord standing for the assertion of third-party rights.
 
 
 17
 The only remaining questions pertinent to standing, therefore, are whether the depositors are within the zone of interests protected or regulated by the relevant statutory provisions; and whether the brokers are entitled to assert the depositors' rights. The former is easy, and we do not even understand it to be contested. The provision of the FDIA that "in determining the amount due to any depositor there shall be added together all deposits in the bank maintained in the same capacity and the same right for his benefit either in his own name or in the name of others," 12 U.S.C. Sec. 1813(m)(1) (1982) (emphasis added), was obviously intended to permit depositors to make insured deposits through others, arguably brokers; and, as we shall see, that provision of the FDIA has some bearing upon the scope of protection afforded by the NHA as well. Depositors wishing to invest through brokers are plainly within the zone of interests protected--or we should say, in order that we not "implicate the merits," that they are "arguably" so, Association of Data Processing Service Organizations, 397 U.S. at 156, 90 S.Ct. at 831.
 
 
 18
 The issue of whether these appellees can assert the interests of depositors is less clear. Its resolution depends upon (1) "the relationship of the litigant to the person whose right he seeks to assert," Singleton v. Wulff, 428 U.S. at 114, 96 S.Ct. at 2874, and (2) "the impact of the litigation on the third-party interests," Eisenstadt v. Baird, 405 U.S. 438, 445, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349 (1972). With regard to the former, earlier cases imply that the relationship at issue here, that between a vendor and vendee, is not enough. See Eisenstadt v. Baird, 405 U.S. at 445, 92 S.Ct. at 1034 (noting that the qualifying relationship in that case "was not simply the fortuitous connection between a vendor and potential vendees"); Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599, 631 (1962). In Craig v. Boren, however, that relationship was deemed sufficient, the Court asserting that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." 429 U.S. at 195, 97 S.Ct. at 456. The same passage was quoted with approval in Carey v. Population Services International, 431 U.S. at 684, 97 S.Ct. at 2015.
 
 
 19
 As to the impact of the litigation on the third-party interests: Here there is no doubt it is substantial. Brokers' ability to sell insured certificates of deposit and depositors' ability to purchase insured certificates of deposit through brokers are so "mutually interdependent," Craig v. Boren, 429 U.S. at 195 n. 4, 97 S.Ct. at 456 n. 4, that they are, to choose an apt analogy, two sides of the same coin. Some of the cases, however, suggest that the third party's interest may not be assertable unless there exists some obstacle to his asserting it himself (which is plainly not the situation here). Thus, in Singleton the plurality opinion (in a portion joined by Justice Stevens) said:
 
 
 20
 Even where the relationship [between the plaintiff and the third party whose rights are being asserted] is close, the reasons for requiring persons to assert their own rights will generally still apply. If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent.
 
 
 21
 428 U.S. at 116, 96 S.Ct. at 2875. The four dissenters' only disagreement with this point was that it did not go far enough:
 
 
 22
 [T]his understates the teaching of [earlier] cases: On their facts they indicate that ... an assertion [of third-party rights] is proper, not when there is merely some "obstacle" to the rightholder's own litigation, but when such litigation is in all practicable terms impossible.
 
 
 23
 428 U.S. at 126, 96 S.Ct. at 2880. The Court's most recent dictum on the subject continues to support the requirement of an "obstacle," if not indeed practical impossibility:
 
 
 24
 In the instant case, the Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech.
 
 
 25
 Secretary of State of Maryland v. Joseph H. Munson Co., --- U.S. ----, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984).
 
 
 26
 The trouble with these dicta is that they do not seem to be borne out by the holdings closest in point to the case before us. In Craig v. Boren, the Court allowed the plaintiff to assert the rights of the vendees (18- to 20-year-old men) even though at least a class suit by those vendees--with a "fluid membership" that would keep the claims alive despite the aging of its original members--was fully possible. After discussing the impropriety of denying jus tertii standing just because of the availability of that peculiar sort of suit, the Court continued: "In any event, we conclude that appellant ... has established independently her claim to assert jus tertii standing"; and then proceeded to the analysis terminating with the statement quoted earlier that "vendors and those in like positions have been uniformly permitted to ... [act] as advocates of the rights of third parties who seek access to their market or function." 429 U.S. at 194-95, 97 S.Ct. at 455-56. We read this passage, prefaced with "[i]n any event," as an independent basis for the decision, recited to justify the result even if the availability of the class action would eliminate the ordinary requirement of obstacle to third-party suit. Similarly, in Carey v. Population Services International, another vendor-vendee case, the Court relied on that status alone. Its only arguable reference to the difficulty of the vendee's bringing suit is the following statement in a footnote:
 
 
 27
 Indeed, the case for the vendor's standing to assert the rights of potential purchasers of his product is even more compelling here than in Craig, because the rights involved fall within the sensitive areas of personal privacy. In such a case potential purchasers "may be chilled from ... assertion [of their own rights] by a desire to protect the very privacy [they seek to vindicate] from the publicity of a court suit."
 
 
 28
 431 U.S. at 684 n. 4, 97 S.Ct. at 2015 n. 4 (quoting Singleton, 428 U.S. at 117, 96 S.Ct. at 2875). We do not think a notation of the a fortiori character of the case qualifies as an acknowledgment of the requisite nature of the element that makes it a fortiori.
 
 
 29
 It must be admitted that the Court's most recent statement in Munson that the defendant's "most serious argument" was the ability of the third party to bring his own lawsuit, since that "might defeat a party's standing outside the First Amendment context" is particularly unsettling, since Munson was also a vendor-vendee case. That dictum could be given effect by distinguishing Craig and Carey on various grounds--including the fact that there, unlike in Munson and Singleton (which contained a similar allusion to the need for "a genuine obstacle" to the vendee's assertions of his own rights, 428 U.S. at 116, 96 S.Ct. at 2875) and unlike the present case, the statute under challenge made the plaintiff's sale unlawful, and the "injury in fact" was specifically recited to include the threat of prosecution, Craig, 429 U.S. at 194, 97 S.Ct. at 455; Carey, 431 U.S. at 683, 97 S.Ct. at 2015. In support of this distinction, it could be said that the very formulation we rely upon most strongly arguably contains this qualification within it ("vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties," Craig, 429 U.S. at 195, 97 S.Ct. at 456; Carey, 431 U.S. at 684, 97 S.Ct. at 2015 (emphasis added)). On the other hand Revere, which allowed third-party standing where the vendor was not subject to any prohibition, did not allude to that distinction, though it appealed to Craig as supporting authority, see 463 U.S. at 243, 103 S.Ct. at 2982. Reliance upon this distinction would produce a rule under which the necessity of establishing the third-party vendee's inability to sue for violation of statute (or constitutional provision) X would depend upon whether or not the plaintiff vendor's activities were explicitly proscribed by statute Y. The logic that might underlie such a rule is not immediately apparent.
 
 
 30
 It may be that Munson's dictum foreshadows a change in what seems to have been the prior law--or a clarification, since in the confused field of jus tertii standing the two can pass for the same.[5] As far as we can confidently tell, however, the change or clarification has not yet occurred, and we feel constrained to follow the holdings in Craig and Carey, which base standing upon the vendor-vendee relationship alone, without inquiry into (or, in the case of Craig, in addition to inquiry into) impediment to third-party suit.
 
 
 31
 We conclude that these appellees have standing to litigate the issue they raise.
 
 III
 
 32
 The manner in which we are to proceed in assessing a claim that agency action contravenes its governing statute is disarmingly simple: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. NRDC, --- U.S. ----, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnote omitted). If, however, "the statute is silent or ambiguous with respect to the specific issue," we are not to give effect to our own estimation of intent, but must accept the agency's if it is "based on a permissible construction of the statute," id. 104 S.Ct. at 2782 (footnote omitted). A "permissible construction" has been helpfully defined as one that is "sufficiently reasonable to be accepted by a reviewing court," FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (internal quotation and citation omitted). We think that this case, insofar as it pertains to the FDIA, calls forth the first portion of this analysis; and insofar as it applies to the NHA, the second.
 
 Federal Deposit Insurance Act
 
 33
 The FDIA provides that the FDIC "shall insure ... the deposits of all banks which are entitled to the benefits of insurance under this chapter." 12 U.S.C. Sec. 1811. An insured deposit is defined to be "the net amount due to any depositor" up to $100,000. 12 U.S.C. Sec. 1813(m)(1). And the net amount due to any depositor is in turn clarified by provision that "in determining the amount due to any depositor there shall be added together all deposits in the bank maintained in the same capacity and the same right for his benefit either in his own name or in the names of others." Id.[6]
 
 
 34
 These provisions establish a clear and unequivocal mandate that the FDIC shall insure each depositor's deposits up to $100,000, determining the amount of those deposits by adding together all accounts maintained for the benefit of the depositor, whether or not in the depositor's name. There is no exception based upon the identity of the person opening, or responsible for opening, the account. Indeed, even the possibility of a (much more plausible) exception based upon the identity of the person in whose name the account is held is explicitly precluded. The statute does, to be sure, grant the FDIC authority to determine the "net amount" due to any depositor; but that cannot reasonably be read to contradict the explicit provision regarding cumulation of beneficial ownership. It was obviously meant to authorize the FDIC to audit the balances of the accounts and to determine the net amounts due "after deducting offsets." See 12 U.S.C. Sec. 1813(m)(1).
 
 
 35
 We decline the parties' invitation to depart from the plain language of these provisions by relying upon their legislative history to "clarify" their meaning. It seems sometimes to be assumed that abandonment of the "plain language rule," see American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982), and increased reliance upon legislative history, should be as natural and desirable a modern development--casting off the formalisms of earlier days--as is the willingness of today's courts to inquire into the parties' pre-signing understanding of a contract they have concluded, despite the formerly rigid constraints of the parol evidence rule. See, e.g., Brawthen v. H & R Block, Inc., 28 Cal.App.3d 131, 136-38, 104 Cal.Rptr. 486, 489-91 (1972). But there is an enormous difference between the two. Legislative history is a second-best indication, not merely because it is (like the oral statements preceding a written contract) a less formal and authoritative expression of what the party intended; but because it is in addition, in most of its manifestations, not even an expression of the relevant party at all. In the case of legislation that party consists not of the witnesses testifying on the bill, or the speakers debating it, or even the committees and floor leaders reporting and presenting it; but of all the voting members of both Houses of Congress and (unless the bill has been passed over a veto) the President. The best legislative history regarding the intent of one or another of the legislative participants is at most a clue as to what the legislating "party" had in mind; the statute itself is the party's only sure expression. Only where that expression is genuinely ambiguous is the clue likely to shed more light than the text. See United States v. Missouri Pacific R.R., 278 U.S. 269, 277-78, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929); Eagle-Picher Industries, Inc. v. EPA, 759 F.2d 922, 929 & n. 11 (D.C.Cir.1985). Nothing in the tortuous legislative history the parties have brought to our attention could possibly overcome the plain language here.
 
 
 36
 Appellants argue, however, that the current rule was authorized by a 1966 amendment which added the following sentence to the end of Sec. 1813(m)(1):
 
 
 37
 For the purpose of clarifying and defining the insurance coverage under this subsection ... the Corporation is authorized to define, with such classifications and exceptions as it may prescribe, terms used [in this subsection] ... and the extent of the insurance coverage resulting therefrom.
 
 
 38
 In our view, that provision has no application here. A general authority to define terms and the extent of insurance coverage resulting from those terms, does not confer power to redefine those terms that the statute itself defines (in this case, the term "amount due to any depositor") and thereby to alter the extent of insurance coverage which the statute specifically accords. The conferral of such a power would amount to a repeal of the originally mandated definition. It is a "cardinal rule ... that repeals by implication are not favored.... In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when [sic ] the earlier and later statutes are irreconcilable." Morton v. Mancari, 417 U.S. 535, 549-50, 94 S.Ct. 2474, 2482-83, 41 L.Ed.2d 290 (1974) (citations and internal quotations omitted). See also Watt v. Alaska, 451 U.S. 259, 266-67, 101 S.Ct. 1673, 1677-78, 68 L.Ed.2d 80 (1981); United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). There is obviously nothing "irreconcilable" between a statutory provision defining one term and another provision giving the implementing agency authority to define terms--i.e., presumably those terms requiring definition. As for an "affirmative showing of an intention to repeal," that appears neither in the language of the amendment nor in its legislative history. The latter contains no expression of an intent to repeal, but if anything displays an intent to further, the prescription that cumulated "beneficial ownership" is the criterion of insurance coverage. See 112 CONG.REC. 25,007 (1966) (statement of Rep. Ashley) ("[T]he purpose of my amendment is to clarify the power of the insuring agencies to prevent the circumvention of the insurance limit by the device of multiple accounts in the same institution"); 112 CONG.REC. 26,472 (1966) (statement of Sen. Robertson) ("[The amendment] would enable the insuring agencies to bar the use of devices such as numerous joint accounts in various combinations, multiple numbered accounts, or revocable trust accounts to obtain insurance far in excess of the limits established by Congress").
 
 National Housing Act
 
 39
 The text of the NHA, unlike that of the FDIA, is far from clear. Its relevant provisions lead back to one another in an endless circle. They provide:
 
 
 40
 (1) The FSLIC "shall insure the accounts of institutions eligible for insurance...."
 
 
 41
 12 U.S.C. Sec. 1725(a).
 
 
 42
 (2) "Each institution whose application for insurance ... is approved by the Corporation shall be entitled to insurance up to the full withdrawal or repurchasable value of the accounts of each of its members and investors...."
 
 
 43
 12 U.S.C. Sec. 1728(a).
 
 
 44
 (3) "In the event of a default by any insured institution, payment of each insured account in such insured institution ... shall be made by [the FSLIC] as soon as possible ... in an amount equal to the insured account of such insured member...."
 
 
 45
 12 U.S.C. Sec. 1728(b).
 
 
 46
 (4) "The term 'insured account' means a share, certificate, or deposit account ... which is held by an insured member...."
 
 
 47
 12 U.S.C. Sec. 1724(c).
 
 
 48
 (5) "The term 'insured member' means an individual, partnership, association, or corporation which holds an insured account."
 
 
 49
 12 U.S.C. Sec. 1724(b).
 
 
 50
 Since an "insured account" is no more than an account held by an "insured member," and an "insured member" is no more than a depositor who holds an "insured account," there is no way we can say that this statute clearly precludes the action the Bank Board has taken--particularly in light of the 1966 amendment conferring authority to define terms, discussed earlier in connection with the FDIA, which was applied to the NHA as well, 12 U.S.C. Sec. 1728(a). We must determine, therefore, whether the agency's interpretation "is based on a permissible construction of the statute," Chevron, U.S.A., 104 S.Ct. at 2782 (footnote omitted).
 
 
 51
 If we had to construe the NHA in isolation, we might well conclude that it is. All parties to the appeal agree, however, that the two statutes before us cannot be construed to reach different results. Because the NHA shares with the FDIA the common purpose of insuring funds placed in depository institutions; and because its legislative history shows that Congress intended it to create the same insurance protection for investors in savings and loan associations as the Banking Act of 1933 had created for bank depositors, see, e.g., 78 CONG.REC. 11,196 (1934) (remarks of Rep. Reilly); 78 CONG.REC. 11,209 (1934) (remarks of Rep. Hancock); 78 CONG.REC. 11,974 (1934) (remarks of Sen. Barkley); these two statutes are in pari materia and must be construed together. See Haig v. Agee, 453 U.S. 280, 300-01, 101 S.Ct. 2766, 2778-79, 69 L.Ed.2d 640 (1981); Oscar Mayer & Co. v. Evans, 441 U.S. 750, 755-56, 99 S.Ct. 2066, 2071-72, 60 L.Ed.2d 609 (1979).
 
 
 52
 The rule [that statutes in pari materia should be construed together] is but a logical extension of the principle that individual sections of a single statute should be construed together, for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject....
 
 
 53
 Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972) (footnote and citation omitted). Thus, "all acts in pari materia are to be taken together, as if they were one law," United States v. Stewart, 311 U.S. 60, 64, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940) (internal quotation and citation omitted). FDIC and the Bank Board have acknowledged the application of that principle to the FDIA and NHA, not only in their argument before us, but in their original decision to issue a joint advance notice of proposed rulemaking, a joint notice of proposed rulemaking, and a joint final rule in their promulgation of these regulations under the separate statutes.
 
 
 54
 The clarity of congressional intent expressed with regard to the FDIA therefore renders it beyond the range of permissible construction for the Bank Board to interpret the NHA as it has. See Busic v. United States, 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980) ("[A] more specific statute will be given precedence over a more general one, regardless of their temporal sequence").
 
 
 55
 * * *
 
 
 56
 For the reasons stated, the District Court was correct in finding both regulations not in accordance with law, 5 U.S.C. Sec. 706(2)(A). The judgment is accordingly
 
 
 57
 Affirmed.
 
 
 
 [1]
 The Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L. No. 96-221, Title II, 94 Stat. 142, see 12 U.S.C. Secs. 3501-3509 (1982), created the Depository Institutions Deregulation Committee ("DIDC") to facilitate the elimination of federal limitations on the maximum rates of interest payable on deposits. 12 U.S.C. Secs. 3501, 3502. The DIDC removed existing ceilings on interest rates for certain deposits, see 12 C.F.R. Sec. 1204.115 (1985), permitted the issuance of certificates of deposit in negotiable form, thus creating a secondary market for them, see 47 Fed.Reg. 15,098 (1982), and permitted depository institutions to pay a fee to brokers for obtaining deposits, see 12 C.F.R. Sec. 1204.202 (1985)
 
 
 [2]
 FAIC sued the FDIC and the Bank Board in the case whose judgment as to each is appealed in Nos. 84-5411 and 84-5408, respectively; and SIA sued them in the case whose judgment as to each is appealed in Nos. 84-5412 and 84-5409, respectively. The District Court consolidated the two actions, and we have consolidated the four appeals
 The complaints also presented, but the District Court did not reach, a claim that the regulations were promulgated in violation of Sections 4 and 10 of the Administrative Procedure Act, 5 U.S.C. Secs. 553, 701-706 (1982).
 
 
 [3]
 The term "deposit broker" is defined in the Final Rule as follows (italicized portions indicate language applicable only to the FDIC, and bracketed portions indicate language applicable only to the Bank Board):
 Except as provided in paragraph (c )[ (b) ] of this section, the term "deposit broker" includes: (1) Any person engaged in the business of placing funds, or facilitating the placement of funds, of third parties with insured banks [in accounts issued by an insured institution] or the business of placing funds with insured banks [in accounts issued by insured institutions] for the purpose of selling interests in those deposits [such accounts] to third parties; and (2) an agent or trustee who establishes a deposit [an] account to facilitate a business arrangement with an insured bank [the institution] to use the proceeds of the account to fund a prearranged loan.
 Final Rule, 49 Fed.Reg. 13,010, 13,011.
 
 
 [4]
 The District Court held that the appellees' interests fall within the "zone of interests to be protected or regulated" because "[h]ere plaintiff's interests are clearly being regulated," 595 F.Supp. at 75 n. 1. That analysis is flawed because the relevant zone for purposes of the test is not that of the statute or regulation challenged, but that of the statute or regulation which forms the basis of the challenge. Glass Packaging Institute v. Regan, 737 F.2d 1083, 1088 (D.C.Cir.1984). Here it is unquestioned that the regulations under challenge seek to regulate deposit brokers; the issue is whether the legislation that assertedly makes those regulations unlawful (the FDIA and the NHA) seeks to regulate or protect them
 
 
 [5]
 We salute in passing Professor Monaghan's recent admirable effort to bring coherence to the vendor-vendee cases by analyzing them as properly first-party standing cases, seeking to vindicate a "freedom to interact with a third person." Monaghan, Third Party Standing, 84 Colum.L.Rev. 277, 299 (1984). If we understand his analysis correctly, it would lead to a conclusion of standing here. "[I]t seems plain that either party to a regulated transaction can challenge any limitation in first party terms, because for each party the claim takes the following form: the state has advanced no sufficient interest to justify prohibiting this interaction." Id. at 303 (footnote omitted)
 
 
 [6]
 12 U.S.C. Sec. 1813(m)(1) provides in relevant part:
 Subject to the provisions of paragraph (2) of this subsection, the term "insured deposit" means the net amount due to any depositor (other than a depositor referred to in the third sentence of this subsection) for deposits in an insured bank (after deducting offsets) less any part thereof which is in excess of $100,000. Such net amount shall be determined according to such regulations as the Board of Directors may prescribe, and in determining the amount due to any depositor there shall be added together all deposits in the bank maintained in the same capacity and the same right for his benefit either in his own name or in the names of others....