Arnold C. EVANS, M.D., Plaintiff,

v.

William J. PERRY, Secretary of Defense, et al., Defendants.

Civil Action No. 96–0268 (JLG).

United States District Court, District of Columbia.

Oct. 29, 1996.

---

Shelley D. Hayes, Washington, D.C., for Plaintiff.

Dara Corrigan, Assistant United States Attorney, Washington, D.C., for Defendants.

### MEMORANDUM

JUNE L. GREEN, District Judge.

## I. Introduction

This matter is before the Court upon cross-motions for summary judgment. The Plaintiff, Dr. Arnold C. Evans ("Dr. Evans") brings this case under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) and asks the Court to reverse a decision by the Defendants to restrict the clinical privileges of Dr. Evans and to require him to be retrained. The Court holds that the actions of the Defendants in this matter were not arbitrary and capricious and, therefore, it shall grant the Defendants' Motion for Summary Judgment and deny the Plaintiff's Motion for Summary Judgment.

## II. Facts

Dr. Evans was hired in January 1992 as a General Medical Officer at Kimbrough Army Community Hospital ("KACH"). Subsequently, he received clinical privileges as a gynecologist. On April 25, 1994, a patient filed a complaint with a KACH Patient Representative, alleging that Dr. Evans had removed unnecessarily her tube during surgery and that he did so without her consent. (Defs.Ex. 4.)

Dr. Evans's supervisor, Dr. Ophelia Patterson, received the patient complaint. (Defs.Ex. 5.) Dr. Patterson was Chief of the Department of Surgery. On April 28, 1994, Dr. Patterson advised Dr. Evans as follows: "A review of [the patient's] chart revealed that the documentation on the history and physical forms was totally unacceptable and does not meet the standard of care at this hospital." (Defs.Ex. 5.)

On the same day, the Credentials Committee convened to address this "potentially serious concern." (Defs.Ex. 6.) The Committee decided to wait until the Department of Obstetrics and Gynecology at Walter Reed Army Medical Center ("WRAMC") assessed the complaining patient before taking any credentialing action. (Defs.Ex. 6.) The Committee also stated, "An additional five cases of this same provider are being reviewed at WRAMC, which came to the WRAMC providers' attention when they were doing surgery here at KACH." (Id.) Although the Committee acknowledged "previous concerns" regarding the adequacy of care provided by Dr. Evans, it concluded that there was insufficient information to do an "abeyance procedure." (Id.) The Committee also alluded to "a question ... raised very recently by one of our staff surgeons concerning Dr. Evans's care." (Id.)

On June 1, 1994, the KACH Commander asked the Deputy Commander at WRAMC to appoint Major John Byron, the Chief of Gynecology to conduct an informal investigation and issue a report concerning the standard of care offered by Dr. Evans between July 1993 and June 1, 1994. (Defs.Ex. 7.) The Committee took no action, regarding Dr. Evans, pending receipt of the report. (Defs.Ex. 8.)

In a letter dated August 2, 1994, the Chief of General Surgery wrote, "I have been directly involved in several cases over the past several months which raise doubt in my mind as to the competence of Dr. Evans and his ability to care for patients independently." (Defs.Ex. 9.) She went on to list several incidents which, in her opinion, demonstrated incompetence on the part of Dr. Evans. (Id.)

On August 3, 1994, the Credentials Committee met to consider Dr. Byron's report, (Pl.Ex. G; Defs.Ex. 20), Dr. Stowell's letter, and other potentially adverse cases identified previously by WRAMC. (Defs.Ex. 10.) The Committee noted that WRAMC gynecologists had come to KACH on a regular basis to see patients in the clinic and do surgery and that their professional interactions with Dr. Evans led them to question his competence. (Id. at 2.) Dr. Byron's report analyzed the care provided by Dr. Evans for the prior six months. (Id.) Out of a total of 27 cases for which Dr. Evans was solely responsible, Dr. Byron determined that in 19 cases the standard of care was not met. (Id.) The Committee concluded that Dr. Evans's chart documentation was "very poor;" that he "displayed a lack of knowledge in handling even the most routine and basic gynecologic problems;" and that he was not conducting adequate exams. (Id.) The Committee unanimously recommended a total suspension of Dr. Evans's privileges. (Id.)

On August 3, 1994, Col. Maguire, the Chairperson of the Credentials Committee, sent a written notice to Dr. Evans advising him that his clinical privileges had been "temporarily suspended" and that the suspension would "generally not exceed 60 days." (Pl.Ex. D; Defs.Ex. 22.) The notice mentioned the basis for the action: the concerns of other physicians and the enclosed report of Dr. Byron. (Id.)

Dr. Evans requested a hearing and sought the presence of Dr. Byron and the records of all cases reviewed by Dr. Byron in his evaluation. On September 19, 1994, September 29, 1994 and October 12, 1994, Dr. Maguire provided further notice of various aspects of the hearing. (Pl.Ex. F, I; Defs.Exs. 25, 26, 28.)

The Credentials Committee held a hearing on October 18, 1994. Dr. Byron appeared as a witness, and discussed each of the 27 cases which he reviewed in his report and described his concerns. (Pl.Ex. J at 2; Defs. Ex. 11 at 2.) Dr. Evans discussed the care he gave in each case and answered questions posed by the Committee. (Id.) Dr. Evans presented a written statement and had an expert witness, Dr. John Clark, testify concerning the quality of care and the appropriateness of Dr. Evans's actions. The Committee report states that Dr. Clark "generally did not discuss any cases specifically" and that he conceded that Dr. Evans's "documentation was substandard." (Id.)

The Committee deliberated for three hours over the entire record including all evidence submitted by Dr. Evans. (Id. at 3.) The Committee found that: (1) Dr. Evans's skills in obtaining adequate patient history and documentation of physical examinations were below acceptable standards; (2) his documentation was poor; (3) his management of common gynecological problems was substandard; (4) his technical performance of laparoscopy was substandard; and (5) his surgical skills and post-operative management were substandard. (Id. at 3–4.) The Committee voted 7 to 1 to maintain the suspension and set terms for later reinstatement.

The Committee recommended that Dr. Evans be given the opportunity to take six months of refresher training in clinical and surgical gynecology after which the Committee would review a written evaluation of his performance and reevaluate his privileging status. (Id. at 5.) The Committee "did not assume responsibility for finding" a training program and "recognize[d] that without this period of training his privileges [would] be revoked." (Id.)

After reviewing the Committee recommendations, Commander David Roberts asked the Committee to clarify its recommendation concerning Dr. Evans's current status. (Defs.Ex. 12.) The Commander believed that a six month suspension was inconsistent with AR 40–68. The Committee convened on November 1, 1994 to discuss the Commander's concerns. (Pl.Ex. M; Defs.Ex. 13.) Ultimately, the Committee decided to limit Dr. Evans's privileges to those of a general medical officer under direct supervision and to require completion of a six-month refresher training to be arranged by Dr. Evans and to commence no later than January 3, 1995. (Id.) Dr. Evans could apply for reinstatement of privileges after successfully completing the program. (Id. at 3.)

On November 22, 1994, the Commander reviewed the recommendations of the Credentials Committee and a post-hearing letter from Dr. Evans's counsel and decided to restrict Dr. Evans's privileges and require him to complete a ninety day refresher training course. (Pl.Ex. P; Defs.Ex. 15.) The Commander reiterated that Dr. Evans had the primary responsibility for arranging re-training. (Id.) By at least November 28, however, the Deputy Commander for Clinical Services took steps to place Dr. Evans in a training program. (Defs.Ex. 31.)

On December 5, 1994, Dr. Evans appealed his voluntary restriction to the Commander of the U.S. Army Medical Command. (Pl. Ex. Q.) The U.S. Army Medical Command Appeals Committee met on May 19, 1995 and recommended that the Commander affirm the decision below. (Pl.Ex. V; Defs. Ex. 17.) On June 7, 1995, the Deputy Commander wrote, "After careful consideration of all the facts, I feel that there is sufficient evidence to uphold the action of Commander [Roberts.]" (Id.) The Commander mistakenly characterized Commander Roberts's final action as a "revocation of [Dr. Evans's] clinical privileges," but this administrative error was corrected ten days later. (Id. at 3.)

Dr. Evans appealed the action to the Surgeon General, (Pls.Ex. X), and the appeal was denied on December 21, 1995. (Pls. Ex. Z; Defs. Ex. 18.)

## III. Discussion

### A. Zone of Interest

■ The Defendants argue that Dr. Evans may not maintain this suit because he does not fall within the "zone of interest" of the regulation that controls this matter. The federal judiciary has adopted this "prudential standing" principle which requires a plaintiff's injury to fall within the "zone of interests" sought to be protected by the provision which furnishes the legal basis for the complaint. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). The zone of

interest adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with the law, since Congress itself has pared back traditional prudential limitations by the APA. *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 357 (D.C.Cir.1985).

■ Although Dr. Evans brings suit under the APA, Army Regulation 40–68 essentially provides the basis for his complaint. One purpose of this regulation is to "[p]romote the professional development and enhance the capabilities of the military and civilian members of the [Army Medical Department]." AR 40–68, ¶ 1–1c. The regulation is, in part, designed to improve the professional development of Dr. Evans, a member of the Army Medical Department. Dr. Evans, therefore, comfortably falls within AR 40–68's "zone of interest."

### B. Administrative Procedure Act and AR 40–68 [1]

■ Under the APA, the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (D) (1996). In reviewing agency action the Court must be guided by "the rule of prejudicial error." 5 U.S.C. § 706 (1996). This rule "requires only a possibility that the error would have resulted in some change" in the final decision. *See Small Refiner Lead Phase–Down Task Force v. E.P.A.,* 705 F.2d 506, 521 (D.C.Cir.1983).

■ When determining the applicable law, courts may "require [an] agency to follow procedural or substantive standards contained in [the agency's] own regulations[.]" *Center for Auto Safety v. Dole,* 828 F.2d 799, 805 (D.C.Cir.1987). The Court, therefore, shall apply Army Regulation 40–68 in deciding this matter.

"Actions to withdraw clinical privileges will be taken promptly when there is ... [a]

---

1. This regulation has undergone amendments. The Court applies the version of the regulation in

force at the relevant time period in this case.

pattern of substandard care." AR 40–68, ¶ 4–9a(3). Actions taken pursuant to AR 40–68 may be summary or routine. AR 40–68, ¶ 4–9a.[2] In a routine case, the credentials committee chairperson may appoint an investigating officer if it is necessary to collect information concerning a practitioner's conduct. AR 40–68, ¶ 4–9c(1). Upon reviewing the report, the chairperson may take summary action or have a hearing committee review the matter "for recommendations as to whether the practitioner's privileges should be suspended, restricted or revoked." AR 40–68, ¶ 4–9c(2)(b), (c). A suspension period cannot exceed 60 days without good cause. AR 40–68, ¶ 4–9d(2).

If a hearing is set, then a practitioner must be notified within fourteen days after any action affecting the practitioner's privileges. AR 40–68, ¶ 4–9e(1). The notice must "specify the deficiencies, suspension, restrictions, and duration, and the right to a hearing before a hearing committee." AR 40–68, ¶ 4–9e(1).

If the practitioner requests a hearing, then the chairperson must provide a written notice to the practitioner that lists, *inter alia*, the following: "the specific concerns that led to the need for the hearing (including dates and pertinent documents where appropriate)[;] . . . [t]he names of the witnesses to be called to testify to the hearing committee." AR 40–68, ¶ 4–9f(2).

Members of the Credentials Committee may act as the hearing committee and a member of the practitioner's discipline should also be a member of the hearing committee. AR 40–68, ¶ 4–9f(9).

The Committee must then review all material presented, including the investigating officer's report and the practitioner's material. AR 40–68, ¶ 4–9f(5). The Committee will provide a summarized record, but in "rare" cases the Chairperson "may" have the hear-

ing recorded verbatim, "if" approved by the MTF Commander. AR 40–68, ¶ 4–9f(5). After reviewing the record, the Committee will decide by a majority vote to recommend, *inter alia*, the following: "[s]etting terms of limitations such as requirements for consultation and identifying deficiencies that require improvement;" "Suspending or limiting clinical privileges and specifying the length of time;" "Revoking clinical privileges;" or "Reconvening the hearing, after appropriate notice to the practitioner, to consider additional relevant evidence." AR 40–68, ¶ 4–9f(6).

AR 40–68 provides the following guidance concerning how the committee must organize its decision:

> The hearing committee should bear in mind the gravity of its responsibilities and the need to clearly document the basis for its findings and recommendations. General statements should be supported by specifically identified incidents or situations. Case histories relied on should be tabbed as exhibits to the record and documented by copies of pertinent medical records where feasible.

AR 40–68, ¶ 4–9f(7).

The committee forwards the hearing record to the MTF Commander who, upon reviewing those items, "make[s] a decision regarding the practitioner's privileges." AR 40–68, ¶ 4–9g. The Commander then notifies the practitioner of the decision. AR 40–68, ¶ 4–9g(3). The practitioner may appeal the Commander's decision to the major MEDCOM Commander who then makes a decision that can be appealed to the Office of the Surgeon General. AR 40–68, ¶ 4–10.

### 1. Dr. Evans's Procedural Claims

#### § 4–9d(2)

Dr. Evans contends that the Defendants violated § 4–9d(2) by maintaining a suspen-

---

**2.** A summary action "immediately details the practitioners involved to nonclinical duties . . ." AR 40–68, ¶ 4–9b(1)(a). A response of this sort is taken in the face of "conduct (or allegations thereof) that requires immediate action to protect the health or safety of patients, . . . or gross negligence or acts of incompetence or negligence causing death or serious bodily injury." AR 40–68, ¶ 4–9b(1)(a) 1–2. In this matter, the Defen-

dants did not take summary action. Dr. Evans's performance caused concern in April 1994, but the Credentials Committee waited for an investigation before suspending Dr. Evans's privileges in August 1994. The procedural safeguards applicable to summary action in AR 40–68 § 4–9(b)(1)–(3), are, therefore, not relevant to this case.

sion for longer than 60 days. Even assuming that there was no good cause for the delay Dr. Evans does not sufficiently prove that such an error caused him prejudice. The record contains nothing that would lead the Court to conclude that the period of suspension affected the ultimate agency decision regarding Dr. Evans.

### § 4–8(e)(1)

The Defendants required Dr. Evans to independently locate and transfer to another facility for retraining, thus violating § 4–8(e)(1). The record demonstrates that the Defendants took action to locate such a placement for Dr. Evans. Dr. Evans, however, complains that efforts to find a training program were undertaken by persons without authority under the regulation. Nonetheless, there is an absence of evidence indicating that Dr. Evans was prejudiced by the Defendants' initial mistake. Likewise, the Court does not find that the efforts on his behalf do not meet the basic purpose of the regulation.

### § 4–9e

■ Dr. Evans complains that the Defendant provided no written notice of the privileging action that specified deficiencies alleged or the duration of suspension. The August 3, 1994 notice sent by the Defendants, however, satisfies the requirements of 4–9e. The notice specifically mentions concerns of other physicians regarding his competence, a review of his patients' records and that the suspension would probably not exceed 60 days. (Defs.Ex. 22.)

### § 4–9f(2)

Dr. Evans argues that the Defendants failed to fulfill their obligation to provide a second more detailed notice regarding the hearing. On September 29, 1994, the Defendants sent Dr. Evans a notice that provided, *inter alia*, the following:

> The allegations to be reviewed are that your expertise in laparoscopic examination is substandard, your cases at times incomplete in the extent of evaluation and/or documentation, and that you may need additional training in the management of uterine bleeding, condyloma, and uterine

leiomyomata. These concerns were based largely on a review of 27 of your cases by Dr. Byron of Walter Reed Army Medical Center. Another copy of his report is attached (encl.) All records are available for your review.

(Defs.Ex. 26.) This statement provides clear notice regarding "[t]he specific concerns that led to the need for the hearing" and is accompanied by Dr. Byron's "pertinent document."

### § 4–9f(5)

The Defendants did not provide Dr. Evans with a verbatim record of the hearing. The regulation states that such transcripts are "rare" and that they "may" be provided. There is no command to furnish a verbatim record and, therefore, Dr. Evans was not entitled to a transcript.

### § 4–9f(6)(c)

■ Dr. Evans claims that the Defendants violated this provision by suspending his privileges without specifying the suspension's length of time. The initial suspension and the ultimate restriction were required to last until Dr. Evans successfully retrained and gained approval upon reapplication. The suspension's duration was predicated on these two events and, therefore, the time frame was reasonably specific.

### § 4–9f(6)(e)

■ Dr. Evans objects to the Hearing Committee reconvening on Nov. 1, 1995 without giving him notice. The Committee, however, did not reassemble to consider "additional relevant evidence", but instead, they met to deliberate further on the legal implications of their prior recommendation. Dr. Evans had no right to be notified of these further deliberations.

### § 4–10e

■ Dr. Evans argues that only the Major MEDCOM Commander and the Surgeon General had the authority to review his appeal and that the subdelegation of appellate review authority, (Defs.Ex. 19), violates § 4–10e. The modern trend of administrative law is to permit "broad subdelegation of

authority within administrative agencies[.]" *See House v. Southern Stevedoring Co.*, 703 F.2d 87, 88 (4th Cir.1983.) Under 40–68, MEDCOM Commanders are responsible for the effectiveness of the Quality Assurance Program. AR 40–68, § 1b. Governmental administrators with broad authority to implement a regulation may generally delegate power "unless expressly forbidden by statute or by the inconsistency of such a delegation with the purposes of the [law]." *Id.* (quoting *Rodriguez v. Compass Shipping Co.*, 617 F.2d 955, 958 (2d Cir.1980), aff'd on other grounds, 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981)). Nothing in AR 40–68 explicitly prohibits a subdelegation of appellate review and, furthermore, such action is not inconsistent with the regulation. The regulation, therefore, should be read to provide the MEDCOM Commander and the Surgeon General with enough flexibility to accomplish its goals. The Court holds that the subdelegation is proper.

### 2. Substantive Agency Findings and Conclusions

In order to determine whether agency action is arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). "The court is not empowered to substitute its judgment for that of the agency." *Id.* In addition, "formal findings" are rarely necessary where the governing law does not require such findings. *Id.* at 417, 91 S.Ct. at 824. A rare instance occurs when the nature of the agency action is ambiguous. *Id.*

The record in this case is clear that the Credentials Hearing Committee's recommendation and the Commander's decision of November 22, 1994 are not arbitrary and capricious. Dr. Byron, the Chief of Gynecology at Walter Reed Army Medical Center, reviewed 27 cases in which Dr. Evans treated inpatients and outpatients over the previous six months. Dr. Evans and he discussed each of the 27 cases with the Credentials Hearing Committee. In addition, the Com-

mittee heard from an expert witness in favor of Dr. Evans. In drawing its conclusions, the Committee referred to events and substandard performance with specificity. In reviewing this matter, it is hard for the Court to imagine a clearer example of a case in which the Court is asked to substitute its judgment for that of the agency. The Court cannot find any clear error of judgment on the Defendants' part.

In a related argument, Dr. Evans claims that the Credentials Hearing Committee recommendations violate § 4–9f(7). The recommendation of the committee clearly documented the basis for its findings and recommendations. The Committee used Dr. Byron's report to identify specific incidents. Dr. Byron's report was also enclosed as an exhibit.

As a final matter, Dr. Evans complains that his subsequent appeals were denied without sufficient explanation. AR 40–68, § 4–10 does not require "formal findings" and this is not the rare instance when the nature of the agency action is ambiguous. The record below is ample enough for the Court to hold that the decisions of the Deputy MEDCOM Commander and the Deputy Surgeon General demonstrate no clear error of judgment.

### IV. Conclusion

The Defendants' actions in restricting Dr. Evans's privileges and requiring him to be retrained are not arbitrary or capricious. Furthermore, none of the Defendants' failures to follow the AR 40–68 caused him such prejudice as to warrant reversal of the agency decision in this matter. The Court, therefore, grants the Defendants' Motion for Summary Judgment and denies the Plaintiff's Motion for Summary Judgment.

An appropriate order accompanies this Memorandum.

### ORDER

Upon consideration of the Plaintiff's Motion for Summary Judgment, Defendants' Opposition and Cross–Motion for Summary Judgment, Plaintiff's Reply and Opposition to Defendants' Cross–Motion for Summary

Judgment, Defendants' Reply, Plaintiff's Supplemental Memorandum, Defendants' Notice of Filing, the arguments of counsel, the entire record and for the reasons given in the accompanying Memorandum, it is by the Court this 28th day of October 1996

ORDERED that the Plaintiff's Motion for Summary Judgment is DENIED; it is further

ORDERED that the Defendants' Motion for Summary Judgment is GRANTED; it is further

ORDERED that this case is DISMISSED.