AMGEN INC., Plaintiff,

v.

Thomas SCULLY, Administrator, Centers for Medicare and Medicaid Services, HHS, and Tommy Thompson, Secretary, Department of Health and Human Services. Defendants

No. CIV.A. 02–2259(EGS).

United States District Court, District of Columbia.

Dec. 26, 2002.

Jonathan Abram, Hogan and Hartson LLP, Washington, DC, for Plaintiff.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

### I. Introduction

Plaintiff, Amgen Inc., a company that develops, manufactures and markets biological products, commenced this action against Thomas Scully, the Administrator of the Centers for Medicare and Medicaid Services ("CMS" or "the agency"), and Tommy Thompson, Secretary of the Department of Health and Human Services ("HHS"). On November 15, 2002, plaintiff filed a motion for preliminary injunction seeking to enjoin defendants from implementing one subsection of a final rule promulgated on November 1, 2002 and scheduled to go into effect on January 1, 2003. On December 7, 2002, Ortho Biotech Products, LP ("Ortho"), a pharmaceutical company which manufactures Procrit, the only product on the market which competes with Amgen's Aranesp, filed a motion to intervene on behalf of federal defendants. The Court granted the unopposed motion to intervene[1] with respect to standing issues only on December 23, 2002.

Without objection from the parties, the Court consolidated plaintiff's request for injunctive relief with the proceedings on the merits pursuant to Fed.R.Civ.P. 65(a)(2). Pending before the Court is defendants' motion to dismiss or, in the alternative, for summary judgment. Upon consideration of the parties' motions, oppositions, replies and oral arguments, as well as the statutory and case law governing the issues, and for the following reasons, the Court concludes that defendants' motion to dismiss plaintiff's complaint is **GRANTED.**

### II. Overview

Plaintiff challenges the "illegal agency action" that resulted in the promulgation of a final rule affecting Medicare's hospital Outpatient Prospective Payment System ("OPPS"). OPPS is the mechanism under which Medicare reimburses hospitals for the outpatient services that they furnish to Medicare beneficiaries. Plaintiff alleges that, in its final rule, CMS, the agency responsible for implementing the Medicare program, unlawfully singled out Aranesp, Amgen's new product, and eliminated its statutorily mandated reimbursement status. Plaintiff alleges that the agency's action was in direct conflict with the "pass-through" statute, 42 U.S.C. § 13951(t)(6)(C), which permits reductions in "pass-through" payments only where necessary to maintain total "pass-through" expenditures within a cap. According to plaintiff, the statute does not authorize CMS to pick and choose among pass-through products, imposing cuts on one and not on others.

Plaintiff contends that, if not set aside, the new rule would not only violate its

---

1. Prior to granting the motion to intervene with respect to standing only, the Court asked the parties whether they had objections.

rights under the pass-through statute, but would also deny seriously ill Medicare beneficiaries access to a new form of innovative medication. Plaintiff states that CMS' action violates the Administrative Procedure Act (APA) and departs from the plain language of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*, because (1)it exceeds CMS' statutory authority; (2) it is arbitrary and capricious in the manner in which it singles out one product for special treatment based on unreliable and inadequate data not intended by Congress to be used for such purposes; and (3) CMS failed to provide notice of its intended action and thereby violated plaintiff's right to due process.

## III. Statutory Scheme:

### A. Medicare Outpatient Prospective Payment System

Title XVIII of the Social Security Act of 1935, commonly known as the "Medicare Act," provides health insurance for individuals 65 years of age and older, some individuals with disabilities under 65, and individuals with end-stage renal disease. The program's primary objective is to ensure that its beneficiaries have access to health care services. Part B of Medicare is a voluntary program that provides supplemental coverage for other kinds of care, including treatment through hospital outpatient departments.

In 1997, Congress enacted the Balanced Budget Act of 1997 ("BBA"), Pub.L. No. 105–33, 111 Stat. 251 (1997), which required the Secretary of HHS to develop a prospective payment system for hospital outpatient services ("OPD services"), 42 U.S.C. § 1395l(t). For covered OPD services, the Secretary is required to develop a classification system for individual services or groups of related services. 42 U.S.C. § 1395l(t)(2)(A)-(B). In implementing this system, the Secretary groups outpatient services into classifications called Ambulatory Payment Classifications ("APCs"). 42 U.S.C. § 419.31. Each APC is a "package" of related medical services that CMS has determined should be grouped together and paid as a whole.[2] For each such service or group of services, the Secretary must establish relative payment weights based on historical data of the median cost of the service(s) within the APC. 42 U.S.C. § 1395l(t)(2)(C). The amount of the OPPS payment to a hospital for a particular service is established in part by multiplying the "conversion factor," the base amount used to determine payments for all services under OPPS, by the APC relative weight. 42 U.S.C. § 1395l(t)(3)(C)-(D). A percentage of this figure is paid by the beneficiary as a co-payment and the remainder is the fee schedule amount for the APC. 42 U.S.C. § 1395l(t)(8).

The statute authorizes the Secretary to make certain adjustments in determining OPPS payments. 42 U.S.C. § 1395l(t)(2). These include wage adjustments to reflect differences in the cost of labor, adjustments for cases with unusually high costs, transitional pass-through payments for certain innovative drugs, biologicals and devices, and "other adjustments as determined to be necessary to ensure equitable payments." 42 U.S.C. § 1395l(t)(2)(D), (E). The Secretary updates the groups, relative payment weights, and wage and other adjustments annually in order to take into account changes in medical practice, changes in technology, the addition of

**2.** Outpatient services typically are performed at a hospital and include routine visits, emergency room visits, x-rays and surgical procedures not performed as part of an inpatient stay. Payments established for APCs can include payment for such things as surgical supplies, drugs, devices and operating room costs.

new services, new cost data, and "other relevant information and factors." 42 U.S.C. § 13951(t)(2), (9).

The OPPS must be budget neutral by law. In accordance with 42 U.S.C. § 13951(t)(9)(B), any adjustments made by the Secretary "may not cause the estimated amounts of expenditures under this part for the year to increase or decrease from the estimated amount of expenditures under this part that would have been made if the adjustments had not been made." *See also* 42 U.S.C. § 13951(t)(2)(E).

### B. Transitional Pass–Through Payments

In 1999, Congress passed the Balanced Budget Refinement Act of 1999 ("BBRA"), Pub.L. No. 106–113, 113 Stat. 1501 (1999), which provides for additional "transitional pass-through" payments to hospitals that use certain innovative drugs, biologicals, and devices for outpatient services. 42 U.S.C. § 13951(t)(6). The BBRA required CMS to make pass-through payments for each qualifying product for at least two, and not more than three, years during which time CMS would collect claims and charge data for each pass-through item. 42 U.S.C. § 13951(t)(6)(C). Generally, once an item no longer qualifies for pass-through payments, CMS incorporates the cost for that item into the APC for the procedure with which it is associated.

Under 42 U.S.C. §§ 13951(t)(2)(E) and 13951(t)(6)(E), the Secretary is to provide for transitional pass-through payments in a budget neutral manner. Thus, if the agency projects that transitional pass-through payments in the upcoming year will be 2.0 percent of total payments, then the agency makes a prospective adjustment to the conversion factor for OPPS payments, a reduction of 2.0 percent, so that the system is budget neutral. 42 U.S.C. § 13951(t)(6)(E) places a limit on aggregate projected pass-through payments as a percentage of total OPPS payments. For calendar year 2003, the total amount of pass-through payments cannot be projected to exceed 2.5 percent of total OPPS payments. If the Secretary estimates before the beginning of the calendar year that total pass-through payments will exceed the 2.5 percent cap, then the Secretary shall reduce *pro rata* the amount of each of the pass-through payments to ensure that the 2.5 percent limit is not exceeded. The reduction applies only to the additional transitional pass-through payments that hospitals receive for using these items, not to the APC fee schedule amount with which the pass-through item is associated.

Under 42 U.S.C. § 1395(t)(6)(D)(i), the additional pass-through payment to hospitals for qualified drugs and biologicals equals the difference between (1) 95 percent of Average Wholesale Price ("AWP") and (2) the amount of the APC payment rate that would be associated with the product if it did not have pass-through status, that is, "the otherwise applicable Medicare OPD fee schedule (payment) that the Secretary determines is associated with the drug or biological," (referred to herein as "the fee schedule payment"). Thus, a hospital using a drug designated for pass-through status under the OPPS would receive 95 percent of AWP, a portion of which is understood as the fee schedule payment and the remainder of which can be understood as the "pass through payment." The co-payment, paid by the beneficiary, is based only on the non-pass-through portion.

## IV. Facts

### A. Aranesp

Aranesp® (darbepoetin alfa) is a biological developed, manufactured, and market-

ed by Amgen. It was first approved by the Food and Drug Administration ("FDA") as a treatment for kidney disease-related anemia in September 2001. Administrative Record ("A.R.") 346. Subsequently, in July 2002, Aranesp was approved by the FDA as an anemia treatment for chemotherapy patients. *Id.*

In September, 2001, plaintiff sought pass-through status for Aranesp. A.R. 3735–80. CMS found that pass-through status was warranted for Aranesp on February 5, 2002, stating that it had "carefully reviewed" Amgen's submission based on the provisions established in the hospital OPPS rules published in the Federal Register on April 7, 2000, and November 13, 2000. A.R. 3781. Aranesp was assigned to APC 734, with an APC payment rate of $4.74, which was 95 percent of the product's AWP. *See* 67 Fed.Reg. 9556, 9562 (Mar. 1, 2002). The first date on which Aranesp was eligible for pass-through payments was April 1, 2002. A.R. 3781.

### B. August 9, 2002 Proposed Rule

On July 2, 2002, Ortho, the manufacturer of the older drug Procrit, suggested to CMS a policy similar to that which CMS would eventually adopt in the final rule. Ortho suggested that CMS change its reimbursement policy so as to reimburse Aranesp and Procrit at the same rate pursuant to CMS' "other adjustment" authority. A.R.1918–22. In the alternative, Ortho suggested that CMS eliminate Aranesp's pass-through status altogether, based on what Ortho characterized as "revised criteria" for determining "continued eligibility" for pass-through treatment in 2003 and beyond. A.R.1922.

Approximately a month later, on August 9, 2002, CMS published a proposed rule addressing 2003 OPPS payment rates and other policy changes. 67 Fed.Reg. 52,092 (Aug. 9, 2002). The proposed rule addressed calendar year 2003 Medicare payment rates and policies under the OPPS. *Id.* It observed that the outpatient pass-through provisions had been "exceptionally difficult to implement" and indicated that CMS was "actively seeking comment on all aspects" of the pass-through rates. *Id.* at 52,093. CMS concluded that it was "open to making changes, perhaps significant, in the final rule based on comments." *Id.* The proposed rule did not specify that "revised criteria" might be used to determine eligibility for pass-through status, as Ortho had suggested weeks before. Nor did CMS intimate that it might use its "other adjustment" authority to equate Aranesp's reimbursement level with Procrit's. CMS proposed to use mechanisms other than imputed acquisition cost ratios to compute pass-through amounts for a limited number of drugs and biologicals. For drugs that are new and are substitutes for a single drug whose cost is recognized in a unique APC, the pass-through amount would equal the difference between 95 percent of the AWP for the pass-through drug and the payment rate for the comparable dose of the associated drug. The payment rate for the comparable dose of the associated drug also would be used to determine the copayment amount for the pass-through drug. *Id.* at 52,118. In the proposed rule, CMS indicated that darbepoetin alfa, that is, Aranesp, "is a new substitute of epoetin (Procrit)." *Id.* at 52,118. Thus, CMS proposed that the pass-through payment for Aranesp be calculated as the difference between 95 percent of the AWP for Aranesp and the fee schedule payment rate for the "comparable dose" of Procrit, whose pass-through status was scheduled to expire in 2003. *See id.*

Interested individuals and entities were given until October 7, 2002, to submit their comments on the proposed rule. 67 Fed. Reg. 53,644 (Aug. 16, 2002).

**14**

### C. Comments on the Proposed Rule

During the public comment period, plaintiff submitted a September 6, 2002 e-mail resubmitting an April 17, 2002 letter from plaintiff to CMS addressing whether Aranesp and Procrit were sufficiently similar to be paid at the same rate. A.R. at 2342–49. The April 17, 2002 letter from plaintiff was a response to a March 29, 2002 Ortho Biotech letter to CMS, submitted by Ortho at a public CMS Town Hall Meeting on 2003 OPPS rates on April 5, 2002. A.R. 2243–49. The announcement of the meeting in the Federal Register invited "(p)roviders, physicians, hospitals, coding specialists, and other interested parties . . . to present their views" on payment methodology for the 2003 OPPS rule. 67 Fed.Reg. 11,969–70. The administrative record includes several other e-mail comments sent to CMS in September 2002, some of which attached references, studies, and previous correspondence for CMS's review. A.R. at 2317–29, 2350, 2351–2357, 2360, 2361–63.

Plaintiff also submitted comments and materials dated September 12, 2002 suggesting that Aranesp and Procrit were not substitutes, and that it would be difficult to develop a comparable dosing relationship between Aranesp and Procrit. A.R. at 284–345.

CMS received comments on the proposed rule from Ortho Biotech on October 1, 2002 addressing the relationship of Aranesp and Procrit. A.R. at 346–66. Ortho urged CMS to find that the two products are substitutes with the same clinical effects and argued that hospitals should be paid at the same rate for both drugs, subject to an appropriate conversion ratio.

In addition, plaintiff attended a meeting at CMS on June 14, 2002, prior to the publication of the proposed rule, where the molecular structure, dosing ratio, price, and relative clinical merits of Aranesp and Procrit were discussed. A.R. at 2259. Plaintiff also submitted supplemental analyses and materials to CMS on these issues in June and July, 2002. A.R. 2250–51, 2260–2273.

### D. Treatment of Aranesp under the November 1, 2002 Final Rule

On November 1, 2002, CMS published a final rule concerning the 2003 OPPS payment rates (the "final rule"). 67 Fed.Reg. 66,718 (Nov. 1, 2002). In this rule, CMS acknowledged that it had proposed to continue pass-through payments for Aranesp. *Id.* at 66,758. Purportedly in response to a comment on the proposed rule submitted by Ortho, CMS then engaged in a discussion of Procrit and Aranesp. CMS noted that the products are not "structurally equivalent," and that Aranesp has a longer half-life than Procrit and can therefore be administered less frequently. *Id.* Nonetheless, CMS announced that it would deny pass-through payments for new drugs or biologicals which are "functionally equivalent" to an older medication for which they substitute. *Id.* Applying this new standard, CMS reduced pass-through payments for Aranesp because it uses the same "biological mechanism" to reach the same "clinical result" as the older Procrit, i.e., both products stimulate bone marrow to produce red blood cells. *Id.*

Under the "functionally equivalent" standard, the agency determined that it would reduce Aranesp's pass-through payment to zero and reduce the reimbursement rate for Aranesp by half, to $2.37 per microgram. 67 Fed.Reg. 66,758–59. This reduction is scheduled to take effect January 1, 2003. *Id.* at 66,718. The tables accompanying the Final Rule include a status indicator for Aranesp ("K") indicating that CMS has now categorized Aranesp as a non-pass-through drug or biological. *Id.* at 66,760 (Table 9), 66,819 (listed

under APC 734), 66,960 (listed under C1774).

As part of the process of determining a conversion ratio between these biologicals, CMS met individually with plaintiff and with Ortho Biotech on September 26, 2002. A.R. at 2365–2411, 2048–94. At this meeting, plaintiff presented evidence on the question of comparable dosage with Procrit. A.R. at 2364, 2365–2411. Plaintiff gave its prepared response to specific questions posed in advance by CMS concerning dosage ratios and various studies and made a presentation consisting of forty-six slides of information about Aranesp and Procrit dosage. *Id.* Plaintiff then followed-up its presentation with at least one e-mail and a detailed letter directing CMS's attention to ten different scientific articles and studies. A.R. at 2412–13, 2414–34.

CMS also reviewed the FDA labeling for each drug and hired a physician consultant, Dr. Robert Rubin of the Georgetown University School of Medicine, to conduct an independent review of the available clinical evidence. Dr. Rubin participated in the September 26, 2002 meeting with CMS. A.R. at 2365. Additionally, CMS performed an internal review of this evidence. The body of literature reviewed included 40 medical articles culled from references submitted by the companies and results generated through a Medline literature search. CMS also took into consideration both published and unpublished studies as well as abstracts, conference reports, and materials provided by the two companies. 67 Fed.Reg. 66,758. After analyzing the evidence discussed above, CMS established the payment rate for Aranesp on the basis of a conversion ratio of 260 International Units of Procrit to one microgram of Aranesp (260:1). *Id.*

Effective January 1, 2003, CMS terminated pass-through payments for Procrit and reduced the pass-through payment for Aranesp to zero. These drugs will be paid at equivalent rates for comparable doses, but in separate APCs. The 2003 payment rate for Procrit is $9.10 per 1000 Units. Using the conversion ratio of 260:1 results in a payment rate for Aranesp of $2.37 per 1 microgram. 67 Fed.Reg. 66,758–59.

## V. Legal Standard

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment.

The issues raised by the motion to dismiss with respect to standing and subject matter jurisdiction are questions of law that may be decided without resort to an administrative record.

The Court will not grant a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). Accordingly, upon consideration of a motion to dismiss for failure to state a claim, the Court accepts as true all of the complaint's factual allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *accord Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985). Plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal*, 16 F.3d at 1276. However, the movant is entitled to judgment if there are no allegations in the complaint which, even if proven would provide a basis for recovery. *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987).

**16**

## VI. Analysis

This Court's jurisdiction to consider plaintiff's claims is limited by Article III of the United States Constitution, which requires federal courts to consider only actual "cases" and "controversies." U.S. Const. art. III. An integral piece of this "bedrock requirement," is that a litigant have standing to raise the claims she seeks to have adjudicated by the Court. *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). "The term 'standing' subsumes a blend of constitutional requirements and prudential considerations," which the Court must address before evaluating the merits of plaintiffs' claims. *Id.* "The rules of standing, whether as aspects of the art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 517–18, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975).

An individual has constitutional standing if (1) she has suffered the "invasion of a legally protected interest which is . . . concrete and particularized," and actual or imminent; (2) her injury is "fairly traceable" to the challenged action of the defendant and not the result of independent action by a third party not before the court; and (3) a favorable decision would "likely" redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

Courts have developed "prudential standing" rules, which act as self-imposed limits on the jurisdiction of Article III courts. The Supreme Court has articulated a "set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll.*, 454 U.S. at 474, 102 S.Ct. 752. These include: (1) the principle that " 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,' " *id.* (citing *Warth*, 422 U.S. at 499, 95 S.Ct. 2197); (2) an avoidance of " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches," *id.* at 475, 102 S.Ct. 752 (citing *Warth*, 422 U.S. at 499–500, 95 S.Ct. 2197); and (3) a requirement "that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question,' " *id.* (citing *Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

Precedent of long-standing recognizes a "rule of self-restraint" barring litigants from claiming standing "to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). A party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197. This is true even where a plaintiff has alleged injury sufficient to meet the "case or controversy" requirement of Article III. *Duke Power Co. v. Caroline Env. Study Group, Inc.*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2643, 57 L.Ed.2d 595 (1978). That a party may indirectly benefit from asserting the rights of a third party will not suffice to confer standing. *See Warth*, 422 U.S. at 514, 95 S.Ct. 2197 (finding no standing where plaintiffs were harmed indirectly by alleged violation of others' constitutional rights).

The rationale for this rule, as consistently articulated by the Supreme Court, is

that courts should avoid adjudicating the rights of parties not before them, rights which the parties "may not wish to assert." *Duke Power*, 438 U.S. at 80, 98 S.Ct. 2620. The prudential rule provides courts with "the assurance that the most effective advocate of the rights at issue is present to champion them." *Id.* The rule also "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy,' ... and it assures the court that the issues before it will be concrete and sharply presented." *Sec'y of State of Maryland v. Joseph H. Munson Company, Inc.*, 467 U.S. 947, 956 n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)(quoting *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)).

The third party standing rule aids the Court in guaranteeing that plaintiffs meet Article III's requirement of a particularized injury. "The prudential limitations add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Sec'y of State of Maryland*, 467 U.S. at 955 n. 5, 104 S.Ct. 2839.

The Supreme Court has, however, recognized some circumstances, in which the prohibition on asserting third parties' legal interests may be relaxed or disregarded altogether. In *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court articulated "three interrelated criteria" for permitting third-party standing: " 'The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the

litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.' " *Miller v. Albright*, 523 U.S. 420, 447, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor, J., concurring) (quoting *Powers v. Ohio*, 499 U.S. at 411, 111 S.Ct. 1364). This third criteria finds its roots in the decision of *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), where the Court noted that: "If there is some genuine obstacle ... the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." *Singleton v. Wulff*, 428 U.S. at 116, 96 S.Ct. at 2875. Thus, the Court has permitted third party standing of litigants against whom a challenged restriction was enforced, where the enforcement also resulted in a violation of a third parties' rights. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C.Cir.1987) (citing *Warth*, 422 U.S. at 510, 95 S.Ct. 2197); *see also Singleton*, 428 U.S. at 113, 96 S.Ct. 2868 (doctors who receive payments for their abortion services are "classically adverse" to government as payer); *Sullivan v. Little Hunting Park*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969); *Barrows v. Jackson*, 346 U.S. at 255–256, 73 S.Ct. 1031.

For several years, the Supreme Court failed to elaborate on the "zone of interests" test. In recent years, however, it has provided further guidance. In the cases of *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), and *Nat'l Credit Union Admin. v. First National Bank & Trust Co.*, 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998)("*NCUA*"), the Supreme Court interpreted the "zone of interests" test fairly broadly. Under *Clarke*, a plaintiff satisfies

the prudential standing requirement if she was herself the subject of the contested administrative act, or if she shows that her rights are not so marginally related to the purpose of the statute that a court will assume Congress did not intend the suit:

> The "zone of interests" test is a guide for deciding whether, in view of Congress' evident intent to make agency action reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Clarke,* 479 U.S. at 399, 107 S.Ct. 750.

■ When applying the "zone of interests" test, a court must "first discern the interests 'arguably ... to be protected' by the statutory provision at issue" and "then inquire whether the plaintiff's interests affected by the agency action in question are among them." *NCUA,* 522 U.S. at 492, 118 S.Ct. 927. For purposes of judicial review under the APA, the relevant statute is the statute "whose violation is the gravamen of the complaint..." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 886, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990).

A recent opinion of the U.S. Court of Appeals for the District of Columbia Circuit addresses the degree of flexibility inherent in the prudential standing test. Citing the case of *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1075 (D.C.Cir.1998), the court held that the D.C. "Circuit has ... explained that '[the prudential standing] analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute

protects.'" *Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426, 444 (D.C.Cir. 1998). The same opinion held that:

> The zone of interests requires some indicia-however slight-that the litigant before the court was intended to be protected, benefitted or regulated by the statute under which suit is brought. Courts should give broad compass to a statute's zone of interests in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court.

*Id.* (citing *Autolog Corp. v. Regan,* 731 F.2d 25, 29–30 (D.C.Cir.1984)).

Pursuant to the "zone of interests" test, the first step in the Court's analysis must be to identify the interests protected by the Medicare Act, the relevant statute. The Medicare statute "establishes a federally subsidized health insurance program to be administered by the Secretary." *Heckler v. Ringer,* 466 U.S. 602, 604, 104 S.Ct. 2013, 2015, 80 L.Ed.2d 622 (1984). Congress described the Medicare program as "more adequate and feasible health insurance protection" designed to "contribute toward making economic security in old age more realistic, a more nearly attainable goal for most Americans." S.Rep. No. 89–404, (1965), *reprinted in* 1965 U.S. U.S.C.C.A.N.1943, 1964.

Given this definition, the next question for the Court is whether plaintiff's interests are within the "zone of interests" intended to be protected by the Medicare Act. In other words, the Court must determine whether the plaintiff drug company was intended to be protected, benefitted or regulated by the relevant statutory provision.

■ Plaintiff makes the following principal arguments in support of its standing to bring this action. First, plaintiff contends that it has prudential standing because it

was the "subject of the contested regulatory action." Pl.'s Initial Mem. on Subject Matter Jurisdiction and Standing at 33. The "contested regulatory action" here is CMS' decision to "revoke" its decision approving plaintiff for pass-through status. 67 Fed.Reg. 66,718, 66,758. After Congress enacted the transitional pass-through statute to assure payment for new drugs and biologicals at 95 percent of AWP, 42 U.S.C. § 13951(t)(6), CMS implemented the statute by establishing procedures whereby individual drugs would be considered for pass-through status. In so doing, the agency expressly recognized the right of "manufacturer[s] or other interested partie[s]," including physicians, patients' groups and hospitals, to make submissions regarding a drug's suitability for pass-through status. *See* 67 Fed.Reg. 18,-434, 18,481 (Apr. 7, 2000). Tr. 12/23/02 at 150–152, 160–61.

Plaintiff construes the agency's decision as regulatory action directly against it, thereby conferring the required standing. *See Liquid Carbonic Indus., Corp. v. Fed'l Energy Regulatory Comm'n*, 29 F.3d 697, 704 (D.C.Cir.1994); *Beverly Health & Rehab. Serv., Inc. v. Thompson*, 223 F.Supp.2d 73, 86 n. 11 (D.D.C.2002); *Bldg. Industry Ass'n of Superior California v. Babbitt*, 979 F.Supp. 893, 900 (D.D.C. 1997); *T & S Prod. Inc. v. U.S. Postal Serv.* Case No. 94–896, 1994 WL 1026493 at *5 (D.D.C., May 26, 1994).

Second, plaintiff argues in the alternative that even if it were not the direct subject of the contested decision, plaintiff would nevertheless meet the "zone of interests" test articulated in *NCUA* and *Clarke*. Plaintiff contends that the "zone of interests" test "is not meant to be especially demanding" and that "there need be no indication of congressional purpose to benefit the would-be-plaintiff." Pl.'s Initial Mem. at 33, (citing *Clarke*, 479 U.S. at 399,

107 S.Ct. 750). Nevertheless, the Court must still resolve the question of whether plaintiff's interest is aligned and consistent with the statutory objectives, rather than "only marginally related to or inconsistent with" the statute at issue. *Clarke*, 479 U.S. at 399, 107 S.Ct. 750.

Third, plaintiff maintains that its mission, as well as that of other drug companies, is to develop and sell medical therapies. While these companies are commercial enterprises, argues plaintiff, their business interests are not inconsistent with the objectives of the Medicare Act. Just as hospitals need reimbursement to provide beneficiaries with care, pharmaceutical manufacturers need monetary incentives to sell their products to health care providers. Plaintiff asserts that firms who are motivated as Congress expected they would be are not thereby acting at cross-purposes with the Medicare statute. Pl.'s Initial Mem. at 34.

In so asserting, plaintiff points to prudential standing jurisprudence recognizing that a plaintiff's commercial interests can be aligned with a statute's "zone of interests" even though plaintiffs are not the subject, or even direct beneficiaries, of a given statute. It further maintains that, even the government concedes that "commercial competitors of regulated firms seeking to enforce those regulations invariably pass the zone-of-interest test." *Id.* (citing Defs.' Mem. Supp. Summ. J. at 28).

Finally, plaintiff contends that, while the Medicare Act was not enacted for the specific purpose of benefitting drug manufacturers, one of the interests "arguably to be protected" by the Act is an interest in full reimbursement for successful new products developed by drug companies, so that Medicare beneficiaries have access to new treatments and technologies. Thus, according to plaintiff, its interest in main-

taining its product's pass-through status is aligned and consistent with the objectives of the Medicare Act because plaintiff seeks to maximize the access that Medicare beneficiaries have to its new product.

Defendants counter that plaintiff lacks standing to maintain the present action because it cannot satisfy the prudential standing requirement by asserting the rights of third parties. They further allege that the only interest plaintiff seeks to protect is its own interest in promoting financial gain. Defendants emphasize that plaintiff must demonstrate that increasing drug manufacturer revenues and market share are among the interests "arguably ... to be protected" by the statutory provision at issue, Defs.' Mem. Supp. Summ. J. at 26, and submit that plaintiff has failed to point to any specific language in § 12951(t)(6)(D), its legislative history, or any other provision of the Medicare Act indicating that the purpose of making pass-through payments is to increase the revenues of drug manufacturers. *Id.* Defendants also maintain that the legislative history of the Balanced Budget Refinement Act of 1999 clearly indicates that the transitional pass-through payment system was enacted solely for the advantage of the beneficiaries of the Medicare program. According to defendants, the only purpose of the pass-through payment provisions was to make certain drugs, biologicals and medical devices available to Medicare patients, not to increase the revenues of drug manufacturers.

Finally, defendants argue that plaintiff's interest in preventing its anticipated loss of market share to the competing biological Procrit is outside the "zone of interests" to be protected by the Medicare statute. While the agency concedes that commercial competitors of *regulated* firms seeking to enforce the regulations invariably pass the test, they point out that the

Medicare Act does not *regulate* the activities of pharmaceutical producers. Rather, CMS only determines which products will be covered under the program and the amount of reimbursement that will be paid to the hospital purchasers of those products. While plaintiff might have a financial interest in a statutory provision intended to promote the use of new pharmaceuticals by hospitals serving Medicare beneficiaries, plaintiff has offered no support whatsoever for the proposition that the congressional purposes underlying the pass-through system included providing pharmaceutical manufacturers benefits for developing new products.

Defendants rely heavily on the case of *TAP Pharmaceuticals v. U.S. Dept. of Health and Human Serv.*, 163 F.3d 199 (4th Cir.1998), in which the Fourth Circuit considered whether standing could be predicated on TAP Pharmaceutical's interest in enforcing the regulatory and statutory provisions requiring reimbursement for a drug to be based not on the cost of a competing drug but on the cost of the drug itself. The court held that even a finding that TAP was more than an incidental beneficiary would not be sufficient to satisfy prudential standing requirements where "a party's claim rests solely on an interest in the enforcement of a statutory provision." *Id.* at 206–07.

With respect to standing, Ortho maintains that its standing to intervene in defense of the challenged rule is co-extensive with that of the plaintiff. It proceeds to argue, however, that neither company meets the standing requirements. It points out that the Medicare program is a federally subsidized health insurance program "designed to insure the elderly against the often crushing costs of medical care." *Heckler*, 466 U.S. 602 at 605, 627, 104 S.Ct. 2013, 80 L.Ed.2d 622. Ortho maintains that neither the Medicare Act

nor its OPPS provisions can be read to encompass the particular interest that plaintiff advances in its litigation, i.e., increasing its market share and diminishing that of Ortho with respect to Procrit.

Having considered the arguments of the parties, as well as those of intervenor Ortho, the Court is persuaded that plaintiff lacks the prudential standing required to maintain this action. The purpose of the Medicare Act is, *inter alia,* to make the best of modern medicine available to the elderly. S.Rep. No. 89–404, (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1964. One of the ways the statute seeks to accomplish this goal is by reimbursing hospitals that provide prescription drugs on an outpatient basis for the drugs that they purchase and provide. The hospitals and the patients are the clear beneficiaries of the Act in general, and the OPPS reimbursement scheme specifically. The drug company is clearly not a direct beneficiary of the Medicare Act, as it is not among those eligible for reimbursement of medical expenses under the federal program. The pass-through payment mechanism was enacted to ensure Medicare *beneficiaries* access to the newest and most effective technology, Defs.' Mem. Supp. Summ. J. at 27 (quoting S.Rep. No. 106–1999 at 17 (1999)), not to ensure drug companies certain levels of sales. Indeed, plaintiff concedes that Congress' "obvious" purpose in making the 95 percent of AWP reimbursement guarantee was to ensure that *hospitals* provide Medicare beneficiaries with new medical products when those were needed. Pl.'s Initial Mem. at 36. Accordingly, plaintiff has failed to demonstrate that providing incentives to, or conferring a benefit on, drug manufacturers was among the purposes, or within the "zone of interests," of the Medicare Act. While there exist statutes, such as, for instance, the Orphan Drug Act, 21 U.S.C. §§ 360aa-ee, that are intended to provide incentives to the pharmaceutical industry, the statutory provision at issue in this case is clearly not among them.

Plaintiff argues that its interests are within the prudential standing "zone" because they are "aligned" with that of the statute's beneficiaries. While plaintiff maintains that its interest in recovering a certain level of reimbursement for Aranesp is consistent with the statute's aim of increasing beneficiaries' access to the drug, the Court is not persuaded that those interests go hand in hand. First and foremost, a reduction in hospitals' reimbursement levels for Aranesp in no way precludes hospitals from purchasing the product altogether. Second, it would be a stretch of the imagination to conclude that the question of whether pharmaceutical companies embark on research and development of new drugs is contingent on the levels of reimbursement provided to third parties for those new drugs under the pass-through provisions of the Medicare statute. Moreover, it is more than conceivable that plaintiff's interests and those of the Medicare beneficiaries would diverge in certain circumstances. For instance, recognition of drug companies' "entitlements" to certain levels of reimbursement would remove the flexibility necessary to best meet beneficiaries' evolving needs. Medicare beneficiaries have no interest in *particular* drugs being reimbursed at higher levels than others. A beneficiary in need of one drug one day might very well find himself or herself in need of another the next.

As far as direct interests are concerned, it appears to the Court that the interest plaintiff is seeking to protect is its own competitive interest in financial gain. While a legitimate commercial objective, this interest is not closely aligned with the objectives of the federal health care insurance act. In fact, the ramifications of

recognizing prudential standing for pharmaceutical companies to challenge CMS' determinations with respect to reimbursement levels to third parties on the basis of such an interest are staggering. It is not difficult to foresee a scenario where a court's recognition of such an interest and standing to protect it could potentially harm beneficiaries' ability to obtain needed services. Additionally, though the possibility unfortunately exists that Medicare beneficiaries may be adversely affected by diminished purchases of Aranesp by hospitals, plaintiff simply has no legal right to assert the interests of those third parties. Likewise, plaintiff has no standing to protect the general public's interest in the development of medical products. *See* Pl.'s Mem. Supp. Summ. J. at 41; *see also Devlin v. Scardelletti*, 536 U.S. 1, 122 S.Ct. 2005, 2009, 153 L.Ed.2d 27 (2002) (noting that prudential standing requirements include the general prohibition on generalized grievances more appropriately addressed to the legislative branch).

With respect to plaintiff's interest in preventing its anticipated loss of market share to Ortho, the Court does not consider that indirect interest to be within the requisite "zone" either. While courts have found that the competitors of *regulated* entities meet the prudential standing requirement, *see Am. Fed'n of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460(7th Cir.1999), neither plaintiff nor Procrit are directly regulated under the Medicare provisions at issue before this Court. CMS does not determine whether Aranesp or Procrit can be sold, the purposes for which the products may be used, or the prices that their manufacturers may charge purchasers. The FDA, not the CMS, is the regulatory body governing pharmaceuticals. For these reasons, this case can be distinguished from the *NCUA* case relied upon by plaintiff. While in *NCUA*, banks were found to have prudential standing as competitors of credit unions, the statute in question in that case, the Federal Credit Union Act, directly regulated the credit unions. In the case at bar, the relationship between the Medicare Act and pharmaceutical companies is far more attenuated.

Plaintiff also relies on a series of cases finding prudential standing based on a vendor-vendee relationship. It cites *Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d 482, 489–92 (D.C.Cir.1987), in which "[the court] treated the respirator seller's interest, and that of the regulated firms, as 'two sides of the same coin.'" *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C.Cir.2002). *Nat'l Cottonseed Prod. Ass'n* involved the application of the "zone of interests" test to a respirator manufacturer seeking to challenge an OSHA regulation that downgraded the rating of its respirators, which were a means of compliance with certain workplace environmental conditions regulations. *National Cottonseed Prod. Ass'n*, 825 F.2d at 489. Applying the "binding precedent" of *FAIC Securities, Inc. v. United States*, 768 F.2d 352, 359 (D.C.Cir. 1985), the court held that "vendors could meet the prudential (standing) requirement even if they did not independently fulfill the zone test; it would do for this purpose if their customers or potential customers passed the test." *Nat'l Cottonseed Prod. Ass'n*, 825 F.2d at 489.

Though the language of the cases is indeed broad, they are readily distinguishable on their facts. In the *Nat'l Cottonseed Prod. Ass'n* case, the entities purchasing the respirators in question were *directly regulated* by OSHA. Specifically, they were cotton processing plants required by the law to purchase respirators pursuant to OSHA regulations. In the present case, the hospitals purchasing plaintiff's product are neither regulated nor required to purchase plaintiff's prod-

uct pursuant to the Medicare provisions under scrutiny by the Court. In the *FAIC Securities* case, a deposit broker and a trade association whose members included deposit brokers challenged as unlawful certain Federal Home Loan Bank Board and Federal Deposit Insurance Company regulations. The regulations in question altered previous rules by adding the proviso that, in the case of funds deposited by or through a deposit broker, insurance coverage would be limited to $100,0000 *per broker*, per financial institution. The depositors alleged that they would be forced out of business by the regulations and that their customers would be deprived of placing deposits through a broker. *Nat'l Cottonseed Prod. Ass'n*, 825 F.2d at 489 (quoting *FAIC Securities, Inc.*, 768 F.2d at 356.) In the present case, Medicare is but a fraction of plaintiff's market, and plaintiff itself is not alleging that it will be forced "out of business" by the regulation providing for lower reimbursement levels to third parties for its product. Similarly, plaintiff's hospital "customers" will not be "deprived" of the opportunity to purchase the product.

In holding as it did in *National Cottonseed Products*, the D.C. Circuit concluded that it was following the *FAIC Securities* case because no "tenable distinction" could be drawn between the relationships and the third parties in the two cases. *Nat'l Cottonseed Products Ass'n*, 825 F.2d at 492. In the present case, a more than tenable distinction can be drawn. Unlike the fact patterns in both cases cited by plaintiff, the hospital purchasers of the products, or vendees, in this case are not regulated entities under the relevant statute. They are merely purchasers of the pharmaceutical products who enjoy reimbursement from the government for their purchases of drugs from manufacturers like plaintiff. Plaintiff has ample market opportunities outside the Medicare system and is not anticipating fatal business consequences from implementation of the final rule.

The case of *TAP Pharmaceuticals v. U.S. Dept. of Health and Human Serv.* is the case most analogous to the present action. In that case, the Fourth Circuit held that a drug manufacturer of Lupron lacked standing to challenge a Medicare Part B reimbursement policy that reduced the amount paid to doctors for providing the plaintiff manufacturer's drug to the amount paid for a competing drug. Based upon its analysis of the governing Supreme Court cases, the Court of Appeals in *TAP Pharmaceuticals* concluded that "when Congress passes a statute regulating a defined class, its intention to limit the class must be given the same respect as its intention to regulate." *TAP Pharmaceuticals*, 163 F.3d at 207. Accordingly, the court held that "where a statute defines a group that is subject to its provisions, a party asserting commercial interests satisfies the "zone of interests" test only if its interests put it in the same position as a member of the subject group or a commercial competitor of such a member." *Id.* The parties subject to the Medicare statute are its beneficiaries who have an interest in receiving reasonable and necessary medical services. TAP Pharmaceuticals was not a member of the regulated class because it "obviously does not receive medical services." *Id.* Moreover, TAP did not directly provide Lupron to patients. Its interest, therefore, was not in providing medical care to beneficiaries, but in "increasing sales of Lupron." *Id.* Finally, the court observed that TAP Pharmaceuticals could not claim standing as a commercial competitor of a party subject to the statute because TAP competes not with Medicare beneficiaries, but with the manufacturer of the drug Zoladex. *Id.* For all of these reasons, the

court concluded that TAP Pharmaceuticals was not within the "zone of interests" protected by the Medicare Part B program.

Applying the principles articulated in *TAP Pharmaceuticals* to the present case leads to the conclusion that, for the reasons outlined above, plaintiff lacks standing to maintain the action. Like the drug manufacturer plaintiff in *TAP Pharmaceuticals,* Amgen asserts an interest in enforcing a statutory provision that purportedly sets the Medicare payment rate for a particular pharmaceutical product on the basis of 95 percent of the average wholesale price of that product, and not on the basis of the Medicare payment rate for a competing pharmaceutical product. Like the plaintiff in *TAP Pharmaceuticals,* Amgen is asserting purely commercial interests in increasing its revenues and preventing loss of market share to its competitor. Like the plaintiff in *TAP Pharmaceuticals,* Amgen is neither a beneficiary of the Medicare statute nor a competitor of an entity that is regulated by that statute. Plaintiff does not receive medical services and it does not compete with Medicare beneficiaries, but with the manufacturer of Procrit. Since its purely commercial interest in the sale of Aranesp does not place it "in the same position as a member" of the beneficiary group or "a commercial competitor of such a member," Amgen, like the plaintiff in *TAP Pharmaceuticals,* cannot satisfy the prudential standing requirements imposed by the APA. *TAP Pharmaceuticals,* 163 F.3d at 208.

This Court recognizes that, in reaching its conclusions, the Fourth Circuit in *TAP Pharmaceuticals* rejected the approach adopted in the unpublished District Court opinion in *Ioptex Research, Inc. v. Sullivan,* Case 90–2346, 1990 WL 284512 (C.D.Cal., Dec. 10, 1990). In that case, the plaintiff was a manufacturer of intraocular lenses ("IOLs") that challenged a final notice issued by HHS establishing the reimbursement rate for IOLs under Part B of the Medicare Act. The United States District Court for the Central District of California held that plaintiff had standing to pursue the case because its interest in gaining wider distribution of its product was not inconsistent with the Medicare Act's purpose of "making the best of modern medicine available to the elderly." *Id.* at *4.

While the facts of the *Ioptex* case are admittedly similar to those at hand, this Court is persuaded by the rationale articulated in *TAP Pharmaceuticals,* which found that the decision in *Ioptex* misinterpreted the Medicare Act's purpose. As the Fourth Circuit stated, the objective underlying the Medicare statute was to make the best of modern medicine *more* available to the elderly than it would be *in the absence of* the Act. *TAP Pharmaceuticals,* 163 F.3d at 205 n. 2 (emphasis added). If the statute had provided reimbursement to pharmaceutical companies directly, rather than to health care providers, or if it had outlined specific incentives for the development of new drugs for the elderly, its aim could more reasonably have been interpreted to be sufficiently aligned with plaintiff's interests to confer standing.

This Court is not alone in adopting the *TAP Pharmaceuticals* court's rationale. The Seventh Circuit has cited *TAP Pharmaceuticals* for the proposition that even those who may be more than incidental beneficiaries of a statute do not necessarily pass the "zone" test. *Am. Fed'n of Gov't Employees, Local 2119,* 171 F.3d at 469 n. 10.

Plaintiff relies heavily on the language of *Ethyl Corp. v. EPA.* In that case, the U.S. Court of Appeals for the District of Columbia held that a fuels additives manufacturer had prudential standing under the

"zone of interests" test to maintain its rulemaking challenge to the EPA's new rule concerning auto manufacturers' compliance with respect to emissions standards:

> [T]he 'zone of interests' protected ... by the Act ... include [ ]not only those challengers expressly mentioned by Congress, but also unmentioned potential challengers that Congress would have thought useful for the statute's purpose [whose challenges thereby support an inference of that Congress would have intended eligibility].

*Ethyl Corp. v. EPA*, 306 F.3d at 1148.

Plaintiff relies on this case to support its argument that the *TAP Pharmaceuticals* case was inconsistent with precedent and "simply wrong." Pl.'s Initial Mem. at 37. The court rejects this characterization. The *TAP Pharmaceuticals* case is the only analogous circuit court opinion addressing the precise issue of pharmaceutical companies' standing pursuant to the provisions of the Medicare Act and its rationale is persuasive. While the D.C. Circuit's language in the *Ethyl* case is admittedly broad, it nevertheless is inapplicable to the present case.

First, the plain language of the *Ethyl Corp.* opinion refers to an implicit expectation on the part of Congress that the plaintiff be "eligible" to challenge the act. In the present case, plaintiff points to no specific language in the pass-through provision or its legislative history to indicate that the purpose of making pass-through payments was to increase drug manufacturers' revenue. In fact, there is evidence that, in enacting the provision, Congress was responding to a concern that oversights in the OPPS system "could lead to restricted *beneficiary* access to drugs, biologicals and new technology." H. Rep. No. 106–436(I) (emphasis added). Similarly, the Senate report indicated that the provi-

sion was intended to "ensure that *beneficiaries have access to* the newest and most effective technology." S.Rep. No. 106–199, Committee on Finance, at p. 17 (1999) (emphasis added).

Second, the interests of the manufacturers of fuel additives and those of the Clean Air Statute are more congruent or aligned than the interests of drug companies and those of the Medicare statute. In the former case, both "interests" are aimed at developing products that will reduce harmful air pollutants. *Ethyl Corp.*, 306 F.3d at 1148. In the latter case, the companies' interest lies in preserving market share and financial gains, while the statute's interest lies in increasing beneficiaries' access to new and innovative drugs. The two interests cannot rationally be deemed "consistent."

## Conclusion

For the foregoing reasons, the defendants' motion to dismiss is **GRANTED** based on plaintiff's lack of standing to bring this action. Because plaintiff is neither a direct beneficiary of the Medicare Act nor engaged in competition against, or sales to, a directly regulated entity, it falls outside the "zone of interests" sought to be benefitted, protected, or regulated by the statute in question. While there is an interdependence among plaintiff, the hospitals involved in the OPPS program and CMS, their interests are not sufficiently congruent or aligned for plaintiff to meet the requirements of prudential standing.

Because the threshold issue of standing has been resolved against plaintiff, the Court need not reach the remaining issues.

An appropriate order accompanies this opinion.

### *ORDER AND JUDGMENT*

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the Court in its Memo-

randum Opinion docketed this same day, it is by the Court hereby

**ORDERED** that defendants' motion to dismiss is **GRANTED;** and it is

**FURTHER ORDERED** and **AD-JUDGED** that the Clerk shall enter final judgment in favor of defendants and against plaintiff, which judgment shall declare that plaintiff's complaint is dismissed for lack of standing pursuant to Fed. R.Civ.P. 12(b)(6).